IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 04-00370-01-CR-W-ODS |
| ) | |
| AHMED ABDI NUR, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION DETERMINING FACTUAL AND LEGAL ISSUES RELATED TO DEFENDANT'S SENTENCING

In light of the complexities involved in Defendant's sentencing, the Court believes it prudent to provide a detailed written order explaining the rationale for the decision announced on March 31, 2006. This will provide a framework for the parties' presentation of arguments regarding the appropriate sentence to be imposed.

## I. BACKGROUND

Defendant was indicted on one count of operating an unlawful money transmitting business (Count 1) and forty-eight counts of structuring transactions to evade currency reporting requirements (Counts 2 through 49). Defendant plead guilty Count 1 pursuant to a plea agreement; as part of that agreement, the Government has agreed to dismiss Counts 2 through 49. The Probation Office prepared a Presentence Investigation Report ("PSR") that prompted several significant objections from Defendant. A sentencing hearing was commenced on March 23, 2006, and continued on March 27, 2006.

The appropriate sentence is to be derived by considering the factors set forth in 18 U.S.C. § 3553(a). Those factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant and (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and provide the defendant with adequate training,

education or care. The starting point in determining the sentence requires calculating the proper range under the Sentencing Guidelines (including, if appropriate, any departures), then considering any sentencing facts related to the guiding factors in § 3553(a). E.g., United States v. Mathijssen, 406 F.3d 496, 498 (8th Cir. 2005).

The crime of operating an unlawful money transmitting business is set forth in 18 U.S.C. § 1960(a), which makes it a crime for anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business . . . ." An "unlicensed money transmitting business" is defined as a money transmitting business that meets one of three conditions; in this case, the parties have focused on the definition in 18 U.S.C. § 1960(b)(1)(A), which describes a money transmitting business that "is operated without an appropriate license in a State where" it is a felony or misdemeanor to conduct a money transmitting business without a license. In other words, because Missouri law provides that it is a misdemeanor to operate a money transmitting business without a state license, federal law makes it a crime to violate the state law.

These provisions were amended in the wake of the terrorist attacks of September 11, 2001. Previously, the statute referred to an "illegal" money transmitting business as opposed to the current reference to an "unlicensed" money transmitting business. In addition, the definition required the defendant to intentionally operate without the appropriate state license and thereby required the defendant to be aware of the licensing requirement. The post-9/11 amendments removed this intent requirement; now, it does not matter whether the defendant knew of the need to obtain a state license.

The parties agree the Sentencing Guidelines effective November 1, 2002, should be applied in this case. This version of the Guidelines dictates that section 2S1.3 should be used to calculate the offense level for violations of 18 U.S.C. § 1960. Defendant has not been convicted of an offense under 31 U.S.C. § 5318 or 5318A, so section 2S1.3(a)(1) does not apply and the Base Offense Level is 6, with an adjustment for the value of the funds unlawfully transmitted. In addition, section 2S1.3(b) sets forth specific offense characteristics that must be considered. Section 2S1.3(b) provides the basis for most of the parties' arguments and will be addressed first. This section provides as follows:

2

(1) If (A) the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity; or (B) the offense involved bulk cash smuggling, increase by 2 levels.

(2) If the defendant (A) was convicted of an offense under subchapter II of chapter 53 of Title 31, United States Code; and (B) committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period, increase by 2 levels.

(3) If (A) subsection (a)(2) applies and subsections (b)(1) and (b)(2) do not apply, (B) the defendant did not act with reckless disregard of the source of the funds; (C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to level 6.

A brief background will be helpful to place the Court's findings[1] in context. Defendant was born in Mogodishu, Somalia, in 1974. He fled the country in approximately 1991 due to the eruption of civil war. Initially, Defendant went to Kenya, but after approximately two and a half years moved to Lancaster, Pennsylvania. While there, he worked in a chicken processing plant. He was contacted by a friend in Kansas City in approximately July 1995, and moved to this city around that time. He worked in a warehouse until sometime in 1999. At that time, he and a partner began a business known as Amal Business Center. This business was described as an "ethnic market," selling dry goods, groceries, clothing, and furnishings.

Defendant operated Amal Counseling Service from the same location as the retail establishment. This business transmitted money to overseas locations. As it turns out, such a business is not uncommon in certain ethnic communities. It is not uncommon for refugees and immigrants from other countries to endeavor to send money to relatives and friends in their country of origin (or elsewhere). The desire to send money is particularly

---

[1] In making these findings, the Court is mindful that while Defendant speaks and understands English, it is not his native language. Consequently, on the occasion of such a momentous event as his possible incarceration, it is not surprising that he solicited the aid of a translator for the hearing. Nonetheless, it is clear to the Court that many nuances of the language and connotations of certain words were lost on Defendant (and, to be frank, the translator).

3

strong with immigrants from Somalia and other African countries. As described in the testimony, people in this part of the world feel obligated not only to family members but also to clans and tribes. Thus, if a Somalian in Kansas City learns of a clan-member or tribe-member in another part of the world who requires an operation, it is customary (and common) for that person to gather money from other members of the tribe or clan also living in Kansas City, pool the funds, and send it overseas. In some cases, Somalians in other parts of the country may also be contacted to contribute to the pool being sent abroad.

However, due to the civil wars, lack of strong governments, and the lack of a banking system, sending money to certain African countries – including Somalia – is a difficult task. As a result, money transmitting businesses are quite common to immigrants from that part of the world. These businesses are modern-day versions of what in Arabic is referred to as an "hawala," which is an informal money exchange business that operates outside of traditional banking or financial channels. In return for a fee, the "hawaladar" collect money from customers wishing to transfer money to other countries, then contact an hawaladar in the recipient country to effect the actual distribution.

The modern-day version involves a central "hub" or clearinghouse in a country in the region that possesses a strong banking system. The Court will describe the process utilizing Defendant's operations. Defendant served as an agent for a company in Dubai, United Arab Emirates, known as Amal Express. Defendant received money from a customer to be sent to someone in Somalia, and would record the recipient's name, city, tribe, clan and sub-clan so the money could be delivered. The form, along with the money, was placed in a zippered bank bag, which was then put in a box behind the cash register. (Defendant did not commingle funds received from customers for transmittal with money taken in by the establishment's retail operations). The information on the form was e-mailed to Amal Express; the transaction was thus initiated before the money was actually sent overseas. Defendant took the box home with him each night and then usually deposited the money the next day. The money was then transferred to Amal Express' bank in Dubai. For his services, Defendant received a portion of the commission charged to the customer; the fee charged to the customer varied depending on the amount of money to

4

be transmitted, but was typically approximately five to seven percent; Defendant retained 25% of the fee and the rest went to Amal Express.

## II. DISCUSSION

### A.

Clearly, determining whether the third Specific Offense Characteristic applies is of utmost importance; if that provision applies, Defendant's Offense Level is reduced to six. It's application depends on whether other Specific Offense Characteristics apply, so it is difficult to discuss any one of the provisions in isolation.

#### *1. Application of Section 2S1.3(b)(1)*

The Government presents three theories justifying application of the first Specific Offense Characteristic. The Court is not persuaded by any of these arguments.

The Government first argues the offense involved bulk cash smuggling, which Application Note 2 defines as structuring transactions to evade currency reporting requirements. The Government contends that even though it is dismissing Counts 2 through 49, Defendant's actions may be considered relevant conduct. The Government's argument is correct as a matter of law; however, the evidence does not persuade the Court that Defendant knowingly structured his transactions to avoid the reporting requirements.

Cash transactions exceeding $10,000 must be reported to the United States Government. The evidence establishes that, between April 16, 2001, and August 27, 2004, Defendant made 48 deposits involving less than $10,000 in cash. Some of these deposits exceeded $10,000 but included a combination of cash and other instruments (e.g., money orders, cashier's checks) that obviated the need to report the transaction. On other occasions, Defendant deposited cash on separate days but sufficiently close in time to cause the Government to believe he divided the transactions so that none of them exceeded $10,000. However, during this same time period, Defendant made 47 deposits

5

that involved more than $10,000 in cash and for which Currency Transaction Reports ("CTRs") were submitted to the Government. The Court finds it difficult to believe that a person is structuring transactions when half of his transactions are both reportable and reported.[2] The Government dismisses this reasoning, contending Defendant only deposited the large sums because Amal Express complained Defendant was keeping too much cash on hand instead of transmitting it immediately. However, the evidence does not support this theory as explaining all (or even most) of Defendant's 47 "unstructured" transactions. Moreover, this fact actually inures to Defendant's benefit; it explains why Defendant made deposits close in time that collectively exceeded $10,000 but individually did not. Amal Express expected the money to be deposited as soon as possible, preferably the same or the following day, so the money would be on hand for distribution to the ultimate recipient. Complying with this directive required Defendant to make deposits close in time regardless of the amount, but this does not demonstrate Defendant was structuring his transactions to evade reporting requirements.[3]

Next, the Government argues the funds were intended to promote unlawful activity. The first unlawful activity described is structuring, and that has been addressed. The second unlawful activity is violation of a blocking order placed on Aaran Money Wire Service, Inc. ("Aaran"). In approximately 2001, Amal Express was endeavoring to change its method of operations. Instead of having each of its agents send money to Dubai, its agents were directed to send the money to Aaran, which would then transmit the money to Amal Express' bank in Dubai. However, on November 6, 2001, Aaran (along with forty-five other entities and sixteen individuals) was listed in a Blocking Order issued by the

---

[2]The Court acknowledges Special Agent Miller's testimony that these transactions did not affect her analysis or alter her conclusion that structuring occurred. The Court simply is not persuaded by that testimony in light of the evidence in the record.

[3]The Government also points to Defendant's apparent use of money orders. The Court finds this was not part of a structuring effort because Defendant's customers sometimes paid him with money orders and other money-equivalents. Therefore, when Defendant deposited cash and money orders it was because that is how his customers paid him and not because he was trying to evade currency reporting requirements.

6

Department of Treasury. The Blocking Order froze the assets of the companies and people listed and prohibited from transferring those assets anywhere, including overseas. Neither Amal Express nor Defendant was listed in the Blocking Order. Amal Express instructed Defendant (and, presumably, its other agents) to resume sending the money directly to its bank because Aaran was prohibited from doing so. The Government characterizes Defendant's compliance with this directive in the face of his knowledge about the Blocking Order as a violation of the Blocking Order. The Court disagrees with several aspects. First, the Government's position improperly extends the scope of the Blocking Order. It did not prohibit those that were formerly using Aaran to transmit money overseas from finding alternative means for doing so. As a more general proposition, it did not even prohibit people from transmitting money overseas; while that activity is regulated by other statutes, the Blocking Order itself did not make it unlawful. The money possessed by Defendant did not belong to Aaran; it was collected by him on behalf of Amal Express and Aaran was simply the intermediary used to transfer money from Defendant to Amal Express. Finally, although it is not a significant point in the analysis, the Court is not persuaded Defendant ever saw the Blocking Order. In fact, the Court is not even persuaded Defendant knew anything referred to in this country as a "Blocking Order" had been issued or what it meant. According to the agents who interviewed Defendant, the Blocking Order was the subject of only two questions. While one of the agent's wrote that Defendant "had knowledge that a blocking order was placed on Aaran Money Wire," the Court does not believe Defendant actually used the phrase "Blocking Order." Defendant knew, based on communications from Amal Express, that Aaran could not transmit the money; so, in a general sense, he was aware of the consequences of the Blocking Order, but the record does not persuade the Court (1) Defendant knew the Department of Treasury froze Aaran's assets or (2) the Blocking Order was intended to prevent him from sending money to Amal Express.

Third, the Government argues Defendant committed bank fraud by hiding the true nature of his business and not disclosing that he was sending money overseas. The Record does not support this conclusion. Defendant introduced a surveillance tape from one of the occasions in which he deposited money in his account. During the conversation, the bank teller and another bank official (apparently, a manager) engaged Defendant in

7

conversation. During the conversation, both bank employees made statements reflecting their knowledge that the money was going to be transferred overseas. This is symptomatic of the largest flaw in the Government's reasoning: Defendant's bank in the United States executed his instructions to send money from his account to Amal Express' bank in Dubai; therefore, Defendant's bank had to know the money was being sent overseas.

The Government points to an occasion in which Defendant allegedly told a teller who asked where his large deposits of currency came from that he was in the consulting business. As a threshold matter, the Government has not explained how this constituted "fraud." Nothing in the record explains how the bank was harmed by this explanation. In any event, Court accords little weight to this testimony. The teller did not testify, and the agent who interviewed her did not identify the exact words the teller used. This is significant because the name for Defendant's money transmittal business was Amal Counseling Service, and an explanation that the money came from a business with that name may have caused the confusion. The Government also faults Defendant for using a name that does not clearly identify the business' function, but has not identified any laws requiring a business' name to clearly identify its operations. Ultimately, in light of the evidence demonstrating (1) Defendant did not hide his intentions and (2) bank personnel knew the money was being sent overseas, this lone statement does not rise to the level of fraud.

Fourth, the Government points to an incident in July 2004 when Defendant went with another individual (Gerad Nor) to Bank of America ("BoA") to open an account. The BoA representative advised Nor did most of the talking because he spoke better English, and explained Defendant wanted to open an account to transfer money from Kansas City to Minnesota. The BoA representative asked if the account would be used to transfer money overseas, and Nor answered that it would not. The Government characterizes this as fraud because Nor was Aaran's President and the money was eventually sent overseas by Aaran. The Government also emphasizes that Nor was one of the individuals specified in the Blocking Order. There are several problems with the Government's argument. First, Aaran was "delisted" from the Blocking Order in August 2002. There is no indication that Nor was delisted, but there is also no indication Defendant ever knew Nor was listed in the

8

first place. Second, at best the Government has established what Nor said; it has not established that Defendant knows what Nor told BoA. Third, it appears Nor accurately described the intended use of the account: to send money from Kansas City to Minnesota. While the BoA representative wanted to know if the money was eventually going to go overseas, the Record does not permit the Court to find he asked a question that was designed to get this answer. This should not suggest the Court finds Nor was being evasive; the Court finds the BoA representative asked about the use of the funds in the account being opened in his bank, and Nor answered truthfully and without any reason to know what the representative was really trying to understand. Finally, and perhaps most importantly, Defendant was properly licensed by the State of Missouri to transmit money overseas in July 2003. Thus, by the time of the July 2004 incident, Defendant was no longer violating 18 U.S.C. § 1960, so nothing that happened at that time is relevant to his criminal conduct. If Defendant committed bank fraud one year after he stopped violating section 1960, the Government is free to charge him with that crime; however, the Court does not find that conduct relevant to the crime for which he is presently being sentenced.

Fifth, the Government argues Defendant committed income tax fraud, contending "[w]hile there has not been a detailed analysis of his income or his returns, the overall sense is that [Defendant] was not fully reporting the income from his money transmitting business or even his own personal income from the business." Government's Sentencing Memorandum at 14. The Court disagrees. After hearing the testimony and reviewing the documentary evidence, the Court does not share this "overall sense." To the contrary, at worst[4] it appears Defendant combined the operations from both businesses on a single Schedule C, but the evidence overwhelmingly establishes that the amounts reported to the IRS were correct – or, at least, so close to correct that fraud cannot be inferred. In addition

---

[4]There was also evidence the tax preparer retained by Defendant continued to list his occupation as "student" even after Defendant was no longer taking accounting classes at National American University. While Defendant bears ultimate responsibility for submitting a correct tax return, the Court cannot conclude this error constituted fraud.

9

to the mathematical calculations, the Court relies on the testimony from the Government's witnesses who repeatedly explained that "this was not a tax case."

Finally, the Government argues some if not most of the money sent overseas was the product of welfare fraud because many of the people sending money overseas were receiving various forms of public assistance. The Government theorizes these individuals could only have sufficient money to send overseas if they had an additional source of income – and if they had an additional source of income, that source was not disclosed as evidenced by the fact the individuals received government assistance of some sort. The Government's proof falls far short of demonstrating Defendant "knew or believed that the funds were proceeds of" welfare fraud. In fact, the preponderance of the evidence does not even demonstrate that any funds were proceeds of welfare fraud.

An analysis of Defendant's business records revealed a total of 2473 transactions destined for other countries from January 2003 through August 2003. Difficulties in locating people (due to name changes caused by an effort to evade warring parties in the flight from Africa, Americanization of names, misspellings, and a variety of other reasons) left the authorities able to identify only 131 of the 489 individuals/customers who initiated the transfers. 106 of those people received public assistance at some time over a three year period, but there is no indication those people were on public assistance *at the time they sent money overseas.* Testimony established that it was quite common for immigrants to receive some form of public assistance after arriving, but the expectation would be that at some point the individual would obtain employment and stop receiving public assistance. Therefore, these statistics are not indicative of anything.

Even if some, most or all of Defendant's customers were on public assistance, there is no indication Defendant knew they were on public assistance. Finally, even if Defendant knew some, most or all of his customers were on public assistance, there is no indication that welfare fraud was being conducted. In this regard, the cultural customs are extremely relevant. Testimony established a commitment to sacrifice so money could be sent overseas; thus, an immigrant – even one on welfare – would live frugally in order to reserve funds for assisting relatives and others in Somalia. Moreover, the concept of pooling money from a large number of individuals is a significant factor. If a Somalian in the United

10

States gathers money from friends, relatives, tribe members, and clan members, then sends that money to a friend, relative, tribe member, or clan member overseas, this does not constitute welfare fraud (testimony from the Government's witness notwithstanding). This is why the Court is not persuaded by the Government's evidence demonstrating (1) Defendant's retail establishment became authorized to accept food stamps in February 2003 and (2) sixteen individuals utilized their EBT cards "during that same period" when they initiated overseas cash transfers (thereby suggesting they had an undisclosed source of additional income). The logical leap from "people on welfare sent money overseas" to "therefore, these people must have undisclosed sources of income" is one the Court is not prepared to take.

The Government does not argue, and its witnesses concede, there is no proof money Defendant sent overseas was used for, much less intended to promote, unlawful purposes. The initial investigation was prompted at least in part by concerns that Defendant played a part in funneling money to fund terrorist activities, and the Court has no quarrel with the Government's efforts to pursue this line of investigation. However, the investigation has revealed a significantly different reality: Government witnesses concede there is no evidence linking Defendant to terrorist activity, and the Government does not even suggest this is a factor that should affect his sentence. This, coupled with the Court's findings, leaves no basis for applying the enhancement in section 2S1.3(b)(1).

### *2. Application of Section 2S1.3(b)(2)*

No argument has been presented suggesting this provision applies.

### *3. Application of Section 2S1.3(b)(3)*

The arguments regarding application of this provision are extremely important: if Defendant prevails his Offense Level is reduced to six, but if he does not his Offense Level will be much higher. The arguments regarding this provision are also viewed through a different lens than those related to Section 2S1.3(b)(1); the Government bore the burden

11

of proof with respect to the enhancements contained therein, but Defendant bears the burden of demonstrating he is entitled to the benefit of this section. United States v. Abdi, 342 F.3d 313, 317 (4th Cir. 2003). The Court concludes Defendant has met this burden.

The Court has held subsection (a)(2) applies and subsections (b)(1) and (b)(2) do not. This satisfies the first requirement of the section. The second requirement is the most difficult one for Defendant to overcome: he must demonstrate that he "did not act with reckless disregard for the source of the funds." However, the Court must consider this requirement in context, which requires considering it along with the remaining requirements and the nature and circumstances of Defendant's business in order to determine whether Defendant acted with "reckless disregard."

As discussed previously, the Somalian culture places great importance on helping others in the community, and the concept of community is quite broad as it extends beyond families to include clans, villages and tribes. This assistance manifests itself in efforts to help those facing a temporary crisis (such as famine or illness) as well as those requiring regular help with daily living. The source of funds extends as broadly as the obligation to assist; money is gathered from families, clans, villages and tribes. Defendant (and others like him) plays an important role as part of the "bank substitute" in this society.

The record establishes the money sent overseas is sent for lawful purposes. This conclusion is supported by (1) testimony establishing the purposes for which certain specific transactions were sent, (2) a general description of the purpose and role of a money transmitter in this culture, and (3) the lack of any evidence to the contrary.[5] Similar considerations also establish the money sent overseas is gathered from lawful sources. The Government suggests the large sums involved in some of these transfers demonstrate that some illegal activity must have been involved in generating the funds, but the Court disagrees. Given the size of the Somalian community in Kansas City and the ability to

---

[5]The Court is aware that the lack of proof of unlawful sources does not prove the existence of lawful sources. However, the Government has conducted a thorough investigation to insure there is no connection between Defendant and terrorist activities; having done so, the Government has not demonstrated any terrorist or other criminal activities resulting from Defendant's overseas transfers. Under these circumstances, the lack of evidence from the Government is some evidence in Defendant's favor.

12

collect funds from Somalian communities in other parts of the country, a large fund can be created by pooling a large number of small contributions. For instance, testimony was received about a recent transfer of $2,500 to victims of a drought in Somalia that was funded by soliciting contributions of $100. The Court declines the Government's invitation to conclude that most of this money had to be from public assistance simply because many Somalians are or were, at some point in time, receiving public assistance.

The Court cannot state with absolute certainty that the funds Defendant transferred overseas at the direction of his customers was the product of lawful activity. The Court cannot even say it is convinced beyond a reasonable doubt. However, the Court is persuaded by the preponderance of the evidence that the money Defendant transferred overseas at the direction of his customers was the product of lawful activity.

This leaves, then, the question of whether Defendant recklessly disregarded the source of the money. There is no doubt Defendant disregarded the source of the money his customers gave him; his own testimony establishes that he did not think to ask. However, having concluded the money was collected from lawful sources and used for lawful purposes, the Court has some difficulty concluding Defendant acted recklessly; in fact, it makes little sense to ask whether one recklessly disregards the true circumstances when the true circumstances prove innocent and there are no "false circumstances." The Sentencing Guidelines to do not define the phrase "reckless disregard," but in other contexts this level of intent/knowledge has been held to mean defendant must "be aware of, but . . . consciously or deliberately ignore, facts and circumstances clearly indicating" the true circumstances. United States v. Garcia-Gonon, 433 F.3d 587, 593 (8th Cir. 2006) (defining phrase "reckless disregard" in context of 8 U.S.C. § 1324(a)); see also United States v. Perez, 2006 WL 696507 (11th Cir. Mar. 21, 2006) (same); United States v. Gonsalves, 435 F.3d 64, 70 (1st Cir. 2006) (defining phrase "reckless disregard" in context of 18 U.S.C. § 1365(a)).

Recklessness should be gauged by the circumstances, and in light of the culture and traditions of the community and the absence of any facts or circumstances Defendant "deliberately ignored" that indicated some "truth" that was hidden, the Court is persuaded Defendant did not act recklessly. In addition to everything else that has been said, the

13

Court notes Defendant's customers for money transmittals were frequently also customers of his retail business. These were people he knew and was familiar with. Defendant was not operating a large national bank, and his customers were not strangers. Just like a banker who might extend services to a customer he knows, Defendant extended services to people he knew. In light of the circumstances, the Court cannot conclude Defendant acted recklessly. Section 2S1.3(b)(3) applies, so Defendant's Offense Level is Reduced to six.

### 4. Acceptance of Responsibility

The parties agree Defendant is entitled to at least a two level reduction for accepting responsibility. A third point is not available because the Offense Level was less than 16 before adjustments for Acceptance of Responsibility were considered. U.S.S.G. § 3E1.1(b) (2002). Consequently, Defendant's Adjusted Offense Level is 4.

### B.

In light of the novel issues involved in applying section 2S1.3(b)(3), the Court believes it prudent to provide an alternative analysis to be applied if the Court's application of that provision proves erroneous. The Court's decisions regarding the application of sections 2S1.3(b)(1) and (2) remain the same, so the critical issues are (1) the adjustment for the amount of money transmitted overseas as required by section 2S1.3(a)(2), (2) the adjustment for acceptance of responsibility, and (3) determination of the ultimate sentence in accordance with 18 U.S.C. § 3553(a).

### 1. The Amount of Money

The Government argues, and the PSR suggests, that the relevant amount of money is approximately $3.8 million, because this is the amount of money Defendant transferred overseas between January 1998 and July 2003. The Court disagrees. While the crime of

14

operating an unlicensed money transmitting business existed before passage of the Patriot Act, passage of that Act drastically changed the nature and elements of the crime by eliminating the requirement that the defendant know about the licensing requirement. It is no exaggeration to say that the law, as amended, really described a completely new crime. The Court finds Defendant was not aware of, (and was not deliberately ignorant of) his obligation to obtain a license from the State of Missouri until FBI and IRS agents told him during the course of an interview in connection with this investigation. Defendant immediately stopped transmitting money overseas and instituted efforts to obtain a license, and did not resume transmitting money overseas until he was in compliance with Missouri law. It is inappropriate to include, as relevant conduct, activity that did not form part of the crime with which he is guilty, particularly when that conduct could not have given rise to criminal charges.

The Record reflects Defendant transmitted approximately $1.57 million overseas between passage of the Patriot Act and his receipt of a license from Missouri. Defendant also argues the sum should be reduced to that portion the Court concludes was actually the proceeds of unlawful activity. Defendant reasons the amount transmitted is relevant only if the Court declines to apply section 2S1.3(b)(3), and the Court can decline to apply that provision only if it concludes some portion of the money transmitted was the product of unlawful activity. The Court acknowledges the force of Defendant's argument, but does not believe it is valid under the Sentencing Guidelines. The Court is obligated to add sixteen levels, bringing Defendant's Offense Level to 22.

### *2. Acceptance of Responsibilty*

As noted earlier, the parties agree Defendant is entitled to at least a two point reduction for acceptance of responsibility but do not agree is whether he is entitled to a third point. The issue is whether Defendant "assisted authorities in the investigation or prosecution of his own misconduct by" either "(1) timely providing complete information to the government" about his involvement in the crime or "(2) timely notifying authorities of his

intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." U.S.S.G. § 3E1.1(b).[6]

The Government contends Defendant did not agree to plead guilty until after he was indicted, pretrial proceedings were conducted, and "extensive pretrial preparations" were completed. Government's Sentencing Suggestions at 15-16. The Guidelines do not require the Defendant to plead before he is indicted or pretrial proceedings are conducted. Section 3E1.1(b)(2) requires him to announce his intention sufficiently in advance of trial to obviate the Government's need to prepare for trial. Examination of the Docket Sheet lends some support to the Government's position: Defendant plead guilty on October 26, 2005, and the trial had been set (but postponed in light of Defendant's announcement) two days prior. The problem the Court has is this: according to Defendant's Objections to the PSR (and with no disagreement from the Government), the plea agreement that was ultimately reached was originally proposed by Defendant and rejected by the Government several months earlier. Thus, the Court views the facts as follows: (1) Defendant proposes to plead guilty pursuant to a plea agreement, (2) the Government rejects the proposal, (3) the Government prepares for trial, (4) the Government agrees to the same plea agreement originally proposed by Defendant, (5) the Government contends Defendant is responsible for the Government's need to prepare for trial. This reasoning is not palatable to the Court.

Regardless, there is no need to decide this issue because Defendant can earn the third point for acceptance of responsibility because he timely provided complete information to the government concerning his own involvement in the offense as described in section 3E1.1(b)(1). The Record reflects Defendant spoke with FBI and IRS agents on two occasions prior to being indicted: once at his place of business and once at his house. He provided the agents with all business records they requested and answered all questions they had. The agents testified Defendant was very cooperative with them and, to their knowledge, did not hide information or make any false statements. The agents told

---

[6]The current version of section 3E1.1(b) requires a motion from the Government before the third point can be awarded. However, the parties agree the Guidelines from 2002 apply, and a Government motion was not required. Therefore, the absence of a motion is not fatal to Defendant's quest.

16

Defendant to stop transmitting money overseas unless and until he obtained a license, and Defendant complied with this directive. Finally, the Government offers no explanation as to why Defendant does not deserve the third point under this provision. For these reasons, the Court awards Defendant a three level reduction for acceptance of responsibility, resulting in an Adjusted Offense Level of 19.

### 3. Application of 18 U.S.C. § 3553(a)

An Offense Level of 19 and a Criminal History Category of I results in a sentencing range of 30-37 months. This, however, is only the starting point; the remaining statutory factors must be considered to derive an appropriate sentence. E.g., United States v. Thomas, 422 F.3d 665, 669 (8th Cir. 2005). These factors demonstrate the sentencing range is too high.

**(a) 18 U.S.C. § 3553(a)(1)**

Some of Defendant's history and characteristics have already been described and will not necessarily be repeated. Defendant is a naturalized citizen; since arriving in this country he has obtained an Associate of Applied Science in Accounting and has operated a retail establishment. He is married and has one child (with another one on the way). Defendant has no criminal history; in other words, he does not simply have zero criminal history points, he has no criminal history whatsoever: no speeding tickets, no arrests, no other history that would be reported even though no criminal history points would be assigned.

There is no doubt Defendant committed a federal offense: he transmitted money from Missouri overseas and did not have a license from the State of Missouri. This is a felony under federal law. However, the crime is only a misdemeanor under state law. As noted earlier, the Patriot Act tightened the rules for those transmitting money overseas and made it easier for authorities to investigate these activities for possible connections to terrorists. The need and wisdom for these legislative changes and the investigation into

17

Defendant's actions is not questioned.  However, at the end of the investigation, the Court is not presented with a person tied to terrorist activity.[7]  Instead, the Court is presented with an individual from another culture, performing a task unique to that culture, who ran afoul of this country's registration/licensing requirements but otherwise engaged in innocent activity.  Defendant should not be sentenced as if the worst suspicions about him were true; the crime in general may indicate great nefariousness, but the crime as committed by Defendant does not.

**(b) 18 U.S.C. § 3553(a)(2)(A)**

An unlicensed money transmitter who sends money overseas to fund terrorists has undeniably committed a very serious offense.  An unlicensed money transmitter who sends money overseas to aid victims of famine and allow immigrants to send money to their relatives has not.  Defendant's crime is, simply, operating a business without the proper license: nothing in the record demonstrates his crime was more serious than this.  Sending him to prison would be greater than necessary to reflect the seriousness of his offense and would be unjust.  Incarceration is also not necessary to promote respect for the law: Defendant stopped his unlawful activity immediately upon learning it was unlawful, and did not resume until he was properly licensed.

**(c) 18 U.S.C. § 3553(a)(2)(B)**

Deterrence should be evaluated on two levels: deterrence with respect to Defendant and deterrence with respect to others who might violate the law.  Defendant's actions to date demonstrate he is unlikely to violate these requirements again, and the Record reflect he possesses respect for the law.  The Court is not persuaded incarcerating Defendant will affect actions of others, and the Court does not believe it just to make an example of him.

---

[7]In fact, had there been a connection to terrorist activity, the Court would probably conclude that even with the enhancement prescribed by section 2S1.3(b)(1) the Guideline Range was insufficient to serve the purposes of section 3553(a).

**(d) 18 U.S.C. § 3553(a)(2)(C)**

The need to protect the public from further crimes from Defendant is nonexistent. This crime did not harm the public, and Defendant has not engaged in any other crimes (much less crimes that harm the public).

**(e) 18 U.S.C. § 3553(a)(2)(D)**

There is no need to provide Defendant with educational or vocational training or other services available in an institutional setting.

The factors weighing most heavily on the Court's decision are: (1) Defendant's behavior upon learning of the law's requirements, (2) Defendant's lack of prior or subsequent criminal conduct, and (3) the absence of evidence demonstrating the money was received from or used for illegal activity. A sentence of two and a half years imprisonment is greater than necessary to accomplish the objectives of 18 U.S.C. § 3553(a). In fact, a sentence of imprisonment for any length of time is greater than necessary to accomplish the objectives of 18 U.S.C. § 3553(a). The Court concludes an appropriate offense level is 6.

## III. CONCLUSION

The Court concludes Defendant is entitled to the adjustment described in section 2S1.3(b)(3) of the Sentencing Guidelines, which results (after the adjustment for acceptance of responsibility) in an Adjusted Offense Level of 4. If this conclusion proves to be incorrect and section 2S1.3(b)(3) does not apply, the Court concludes Defendant's Adjusted Offense Level is 19; however, the resulting sentence would be greater than necessary to comply with the objectives specified in 18 U.S.C. § 3553 and the Court would reduce the Total Offense Level to 6. This reduction is necessary to permit the Court to

impose a sentence that is reasonable in light of the circumstances.  Cf. United States v. Booker, U.S. v. Booker, 1258 S. Ct. 738, 765-66 (2005).

IT IS SO ORDERED.


DATE: March 30, 2006

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT